5 A.3d 323 (2010)
In the Interest of J.M., a Minor, Appellant.
No. 2072 MDA 2009
Superior Court of Pennsylvania.
Submitted June 28, 2010.
Filed August 23, 2010.
Juliette M. Zaengle, Public Defender, for appellant.
Magan Ryland-Tanner, Asst. Dist. Atty., for Com., appellee.
*324 BEFORE: BENDER, SHOGAN and CLELAND [*], JJ.
OPINION BY BENDER, J.:
Appellant, J.M., appeals from the order renewing his involuntary commitment for inpatient treatment for potentially sexually violent behavior in accordance with 42 Pa. C.S. § 6404.[1] J.M. contends that the evidence was insufficient to support his recommitment and that a plan for his discharge was not formulated in accordance with section 6406(c). We affirm.
In October of 2003, a juvenile petition was filed alleging that J.M. committed rape, involuntary deviate sexual intercourse (IDSI), aggravated indecent assault, indecent assault, and statutory sexual assault. J.M.'s younger sister was the alleged victim of these crimes. On October 31, 2003, J.M. was adjudicated delinquent of the charges of aggravated indecent assault, indecent assault, and statutory sexual assault. The disposition of the remaining charges was deferred. J.M. was placed in the sex offenders program at the New Castle Youth Development Center.[2] On March 24, 2005, J.M. was transferred to Safeguards Foster Care Program where he disclosed many aspects of his sexual history which he had previously hidden. On May 22, 2006, J.M. was adjudicated delinquent of the remaining charges of rape and IDSI. He was placed at Cove PREP Treatment Facility for Adolescent Sexual Offenders.
On July 27, 2007, J.M. was referred to the Sexual Offenders Assessment Board (SOAB), pursuant to Act 21, to determine whether he should be involuntarily committed for further treatment. "A person may be subject to court-ordered commitment for involuntary treatment under [Act 21] if the person:"
(1) Has been adjudicated delinquent for an act of sexual violence which if committed by an adult would be a violation of 18 Pa.C.S.A. § 3121 (relating to rape), 3123 (relating to involuntary deviate sexual intercourse), 3124.1 (relating to sexual assault), 3125 (relating to aggravated indecent assault), 3126 (relating to indecent assault) or 4302 (relating to incest).
(2) Has been committed to an institution or other facility pursuant to section 6352 (relating to disposition of delinquent child) and remains in the institution or other facility upon attaining 20 years of age.
(3) Is in need of involuntary treatment due to a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence.
42 Pa.C.S. § 6403(a). Once it is determined that a person meets the first two requirements of section 6403(a), the SOAB is charged with assessing whether that individual "is in need of commitment for involuntary treatment due to a mental abnormality.. . or a personality disorder, either of which results in serious difficulty in controlling sexually violent behavior." 42 Pa.C.S. § 6358(a), (c).
Under Act 21, if this assessment concludes that the person is "in need of involuntary treatment," and the court *325 concludes that a prima facie case has been presented, the court is to order that a petition be filed by the county solicitor or designee indicating that the person has met the three requirements of Section 6403(a) outlined above and should be involuntarily committed. See 42 Pa.C.S. § 6403(b)(1). After the filing of the petition, the court is required to hold a hearing at which the person has the right to appointed counsel if the person cannot afford counsel. See 42 Pa.C.S. § 6403(b)(3). The person also has the right to be assisted by an expert in this field, and if he or she cannot afford one, the court will pay for one. See 42 Pa.C.S. § 6403(b)(4).
. . .
At the hearing, it is the Commonwealth that bears the burden of proof of showing by clear and convincing evidence that "the person has a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence." 42 Pa.C.S. § 6403(d) [(emphasis omitted)]. If the Commonwealth meets this burden, the court is to enter an order committing the person to inpatient treatment for a period of one year. See 42 Pa.C.S. § 6404(a).
In re A.C., 991 A.2d 884, 888-89 (Pa.Super.2010).
In J.M.'s case, on June 20, 2008, the court determined that a prima facie case had been established and concluded that J.M. was in need of involuntary commitment under the provisions of Act 21. A petition for involuntary treatment was filed on November 5, 2008, and a hearing was held on that petition on November 17, 2008. The court subsequently found that the Commonwealth had presented clear and convincing evidence that J.M. suffered from pedophilia which caused him to have serious difficulty controlling sexually violent behavior. See Juvenile Court Order, 11/21/08, at 1. The court also determined that, if released, J.M. would likely engage in acts of sexual violence. Id. Thus, the court ordered that J.M. be committed for involuntary treatment at Torrance State Hospital. J.M. did not appeal that order and began his year of treatment at Torrance.
On November 10, 2009, the court conducted a statutorily mandated annual review of J.M.'s involuntary commitment in accordance with 42 Pa.C.S. 6404(b)(2), which states:
The court shall schedule a review hearing which shall be conducted pursuant to section 6403(c) (relating to court-ordered involuntary treatment)[[3]] and which shall be held no later than 30 days after receipt of both the evaluation and the assessment under paragraph (1). Notice of the review hearing shall be provided to the person, the attorney who represented the person at the previous hearing held pursuant to this subsection or section 6403, the district attorney and the county solicitor or a designee. The person and the person's attorney shall also be provided with written notice advising *326 that the person has the right to counsel and that, if he cannot afford one, counsel shall be appointed for the person. If the court determines by clear and convincing evidence that the person continues to have serious difficulty controlling sexually violent behavior due to a mental abnormality or personality disorder that makes the person likely to engage in an act of sexual violence, the court shall order an additional period of involuntary treatment of one year; otherwise, the court shall order the discharge of the person. The order shall be in writing and shall be consistent with the protection of the public safety and appropriate control, care and treatment of the person.
Id. (emphasis added).
At J.M.'s recommitment hearing, Dr. Robert M. Stein, the assessor for the SOAB, stated that, while J.M. had the mental abnormality of pedophilia, there was no "imminent risk" that he would commit another sexually violent act if released into the community. N.T. Act 21 Hearing, 11/10/09, at 9, 11. Dr. Stein concluded, therefore, that J.M. no longer met the criteria for commitment under Act 21. In support of his opinion, Dr. Stein explained:
[Dr. Stein]: My understanding of the statute is that in order to meet Act 21.. . there must be imminent risk that the individual has sufficient difficulty in controlling sexually dangerous behavior that in the very short term would be at high risk of committing a sexually violent act.
What I found in this case is that the rule violations that [J.M.] engaged in involve behaviors that are problematic but not necessarily indicative of being imminent risks to the community.
Those behaviors included masturbating in his room with the blind up which would be a form of exhibitionism though not completely. There wasn't actually people watching him, but it would be a high risk behavior.
For example, there was an instance in which he looked at a computer screen screen saver that had pictures of children on it. In the short term [J.M.] is able to identify what high risk triggers are.
One of the most potentially problematic is the use of pornography. When we had his original Act 21 assessment, when in the community, he indeed did look at pornography. But, as we look at the situation now, despite his diagnosis of pedophilia, there does not seem, in my opinion, to be sufficient enough significant dangerous behavior over the course of the past year that makes him at imminent risk to offend if released soon.
[The Commonwealth]: And I want to talk to you a little bit aboutmore about this imminent risk. You indicated that that's something that you look for. Is that set forth by the [SOAB]?
[Dr. Stein]: Yes. The statute itself and the statutory language does not make clear in terms of time frame, it merely says sexuallyserious difficulty in controlling sexually dangerous behavior. My understanding from the training we receive at the [SOAB] is that that is interpreted to mean imminent risk such as one would look at in psychiatric commitments in general where a person is committed if they're seen to be at imminent risk, suicidal, homicidal, imminent risk of sexually dangerous behavior.
[The Commonwealth]: You talk about imminent risk, what type of time frame are you talking about?
[Dr. Stein]: A time frame on the order of a month rather than years. If I had to be pinned down I'd say something *327 like three to six months. We're not looking at 24 hours. We're not saying someone is going to run out and commit an offense, but if we believe that in the order of a few months someone will re-offend we would interpret that as imminent risk. I do believe that in the long term [J.M.] does carry a high risk, but he has enough strategies now in the short term he can manage his behavior.
Id. at 11-13 (emphasis added). When asked about J.M.'s likelihood of reoffending at some point during his lifetime, Dr. Stein stated that J.M. "is at a high risk to reoffend." Id. at 13. However, Dr. Stein also opined that J.M. does not have "serious difficulty in controlling sexually violen[t] behavior that would make him likely to engage in an act of sexual violence if he continued with less restrictive treatment[.]" Id. at 18.
Tara Travia, Ph.D., a licensed psychologist and the Clinical Director at Torrance State Hospital, also testified at J.M.'s review hearing. Dr. Travia was qualified as an expert in the field of evaluation, assessment and treatment of adult and juvenile sexual offenders. Id. at 20-21. She explained that J.M. has serious difficulty controlling his sexually violent behaviors. Id. at 45. She further opined that there is a strong likelihood that J.M. would reoffend if he were released into the community. Id. at 46. She explained:
[Dr. Travia]: I believe that if [J.M.] was released now he does not have sufficient coping mechanisms to deal with the stressors that he would be encountering if leaving placement after having been in one for a number of years, such as having to find a job, food, having no direct access to any and no access to sexual outlets, nothing appropriate, at least. Would there be relationships within the community he would be able to fall back on.
I don't believe he has the skills to resist if he seeshe has a pattern of masturbating in the [bathroom] stallto proposition a child. I don't have enough evidence to say he changed significantly from when he arrived at that moment. And I believe that those stressors are very strong. And at the moment I have not seen that he has those coping mechanisms. If he has them I can't see them because he hasn't been in that position.
I believe he still continues to have arousal to children. He admitted to that, that he still has fantasies and thoughts lead to behaviors that arethat's a general avenue for sexual offending is having an arousal and not having other outlets and acting on that arousal.
Id. at 56-57. Accordingly, Dr. Travia concluded that J.M. should not be released from involuntary impatient commitment. Id. at 47.
Michael Piemonte also testified for the Commonwealth. Mr. Piemonte, J.M.'s clinical therapist at Torrance State Hospital, testified that his greatest concern with J.M.'s treatment was his dishonesty. Id. at 64. Mr. Piemonte also stated that he was disturbed by J.M.'s "obsessive dialogue regarding re-establishing a relationship with [his] sister," who was the victim of J.M.'s underlying sexual offenses. Id. at 62, 64.
At the conclusion of the testimony, the court found that J.M. suffers from the mental abnormality of pedophilia and that the Commonwealth had proven by clear and convincing evidence that J.M. has serious difficulty controlling sexually violent behavior. The court also concluded that, if released, J.M. would likely engage in an act of sexual violence. Accordingly, the court ordered that J.M. be recommitted to *328 involuntary treatment at Torrance State Hospital.
J.M. filed a timely notice of appeal of the court's order, as well as a timely concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Herein, he raises the following two issues for our review:
(1) Whether the statute 42 Pa.C.S.A. § 6403 et seq's requirements arwe [sic] to be met before a juveniles [sic] continued involuntary commitment at the Sexual Responsibility and Treatment Center (SRTC) is renewed[?]
(2) Whether the SRTC and Department of Public Welfare is under an obligation to facilitate [J.M.'s] release in the community under 18 Pa.C.S. § 6304(d)[?][4]
J.M.'s Brief at 3.
While not expressly phrased as such, in his first issue, J.M. argues that the evidence was insufficient to support the court's renewal of his involuntary treatment because the Commonwealth failed to prove that he has serious difficulty controlling sexually violent behavior and that he is likely to engage in an act of sexual violence if released.[5]See 42 Pa.C.S. § 6404(b)(2). Specifically, J.M. contends that, because Dr. Stein of the SOAB concluded that he no longer meets the criteria for involuntary treatment under Act 21, he should not have been recommitted. However, Dr. Stein's opinion was based on his belief that "in order to meet Act 21 . . . there must be imminent risk that the individual has sufficient difficulty in controlling sexually dangerous behavior that in the very short term would be at high risk of committing a sexually violent act." N.T. Act 21 Hearing, 11/10/09, at 11 (emphasis added). Consequently, the juvenile court disregarded Dr. Stein's opinion in this vein, stating:
It is obvious that Dr. Stein's opinion incorporated the concept of "imminent" into the equation. There is no mention of imminence in the statute and thus[,] to the extent that Dr. Stein's opinions included such a concept, it was discounted.
Juvenile Court Opinion (J.C.O.), 2/1/10, at 6.
Therefore, before we can evaluate whether the Commonwealth's evidence was sufficient to support the court's decision to recommit J.M., we must first determine whether Act 21 requires the court to find that the person presents an "imminent risk" of reoffense due to their difficulty in controlling sexually violent behavior.[6] This is a question of statutory interpretation and, thus, our standard of review is *329 plenary. In re K.A.P., 916 A.2d 1152, 1155 (Pa.Super.2007) (quoting Commonwealth v. Shiffler, 583 Pa. 478, 879 A.2d 185, 189 (2005) (citation omitted)). In Shiffler, our Supreme Court explained the undertaking of statutory interpretation as follows:
Our task is guided by the sound and settled principles set forth in the Statutory Construction Act, including the primary maxim that the object of statutory construction is to ascertain and effectuate legislative intent. In pursuing that end, we are mindful that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Indeed, "[a]s a general rule, the best indication of legislative intent is the plain language of the statute." In reading the plain language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," while any words or phrases that have acquired a "peculiar and appropriate meaning" must be construed according to that meaning. However, when interpreting non-explicit statutory text, legislative intent may be gleaned from a variety of factors, including, inter alia: the occasion and necessity for the statute; the mischief to be remedied; the object to be attained; the consequences of a particular interpretation; and the contemporaneous legislative history. Moreover, while statutes are generally to be construed liberally, penal statutes are always to be construed strictly, and any ambiguity in a penal statute should be interpreted in favor of the defendant.
Shiffler, 879 A.2d at 189 (citations omitted).
Applying these principles instantly, we conclude that Act 21 does not require the court to find that a person presents an "imminent risk" before he or she may be involuntarily committed. The explicit language of the statute directs that if the court finds, inter alia, clear and convincing evidence that a person is "likely to engage in an act of sexual violence," the court shall recommit the person to another one year term of involuntary treatment. 42 Pa.C.S. § 6404(b)(2). We do not believe that "likely," nor any other word in the statute, is synonymous with "imminent." To conclude that a person is "likely" to reoffend, the court must find that it is "probable" that they will do so. See The New Oxford American Dictionary 988 (1st ed.2001). There is no temporal requirement attached to that word. On the contrary, the term "imminent" is temporal by its very nature, as it requires that something be "about to happen." Id. at 850. There is no indication in the plain language of Act 21 that our Legislature intended to require not only the probability of a reoffense, but also that the reoffense be "about to happen." Accordingly, we decline to add this additional element.
Furthermore, even if the statute's language did not explicitly say "likely" instead of "imminent," we believe our interpretation of Act 21 comports with the purpose and goals of the statute and the problem it seeks to remedy. As explained in In re K.A.P.,
juveniles ordinarily leave the jurisdiction of the juvenile court system when they reach age 21. In passing [Act 21], the Legislature foresaw that some of these juveniles were sexual offenders (and potential re[]offenders) in need of treatment for their own benefit and for the protection of the public. The Legislature provided a program of involuntary civil commitment to serve those needs. In the absence of such a program, these offenders would presumably be released outright once they reached age 21.
*330 In re K.A.P., 916 A.2d at 1162 (citation omitted). In light of the purpose and goals of Act 21, it would be unreasonable for us to hold that even if a court finds that a person is likely to reoffend, it could not continue their commitment unless the Commonwealth proved that the person would reoffend shortly after being released. Adding this requirement would defy our Legislature's goal of providing treatment for people who are likely to commit another sexually violent crime at some point in their future.
Accordingly, we hold that Act 21 does not require the court to find, by clear and convincing evidence, that a person has serious difficulty controlling sexually violent behavior such that there is an "imminent risk" that the person will reoffend if released. Instead, the plain language of the statute reveals the Legislature's intent to require only that the court find clear and convincing evidence that the person is likely to reoffend at some point in the future before recommitting them under section 6404(b)(2).[7]
Now that we have clarified the statutory elements of Act 21, we are able to evaluate whether the Commonwealth presented sufficient evidence to prove those elements in J.M.'s case. In Commonwealth v. Troy, 832 A.2d 1089 (Pa.Super.2003), we explained that:
The standard we apply in reviewing the sufficiency of the evidence is whether viewing all evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.
Id. at 1092 (citations omitted).
Instantly, despite the fact that Dr. Stein stated that J.M. did not meet the criteria for involuntary commitment, Dr. Travia's *331 testimony supported the juvenile court's determination that the Act 21 requirements were satisfied. Dr. Travia expressly stated that J.M. has serious difficulty controlling his sexually violent behaviors and would likely reoffend if released from commitment. N.T. Act 21 Hearing, 11/10/09, at 45-46. She provided a detailed explanation of why she was concerned about J.M.'s reoffending. Id. at 56-57. Mr. Piemonte also expressed concern about J.M.'s progress in treatment, specifically citing his dishonesty and his desire to reestablish a relationship with his victim. Id. at 62, 64. Because "the trier of fact while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence," the court was free to believe Dr. Travia's and Mr. Piemonte's testimony and not Dr. Stein's. Commonwealth v. Troy, 832 A.2d 1089, 1092 (Pa.Super.2003). Accordingly, the evidence was sufficient to support the court's decision to recommit J.M.
Lastly, J.M. argues that Act 21 required the Lebanon County Department of Mental Health and Mental Retardation to facilitate a plan with Torrance State Hospital for his release. He avers that no such plan was ever formulated. However, based on our conclusion that the court did not err in recommitting J.M., the issue of a discharge plan is irrelevant at this point in time.
Order affirmed.
Judge CLELAND concurs in the result.
NOTES
[*] Retired Senior Judge assigned to the Superior Court.
[1] Section 6404 is part of a statute commonly referred to as "Act 21," which encompasses 42 Pa.C.S. §§ 6401-6409.
[2] The court ordered that J.M. be placed in the "New Castle State Treatment Unit," but we believe the court was referring to the New Castle Youth Development Center.
[3] Section 6403(c) states:

(c) Hearing.A hearing pursuant to this chapter shall be conducted as follows:
(1) The person shall not be called as a witness without the person's consent.
(2) The person shall have the right to confront and cross-examine all witnesses and to present evidence on the person's own behalf.
(3) The hearing shall be public.
(4) A stenographic or other sufficient record shall be made.
(5) The hearing shall be conducted by the court.
(6) A decision shall be rendered within five days after the conclusion of the hearing.
42 Pa.C.S. § 6403(c).
[4] We believe that J.M. cited the wrong section of Act 21 in his statement of this issue. It appears from examining the argument portion of his brief that J.M. intended to cite to 42 Pa.C.S. § 6406(c).
[5] J.M. concedes that he has the mental abnormality of pedophilia. See T.C.O. at 4.
[6] We acknowledge that J.M. presents no argument supporting Dr. Stein's interpretation of Act 21 as requiring an "imminent risk" under section 6404(b)(2). Accordingly, under normal circumstances, we would conclude that J.M. has waived this issue. See Commonwealth v. Hardy, 918 A.2d 766, 771 (Pa.Super.2007), appeal denied, 596 Pa. 703, 940 A.2d 362 (2008) (stating it is an appellant's duty to present sufficiently developed arguments for our review, including pertinent discussion and citations to legal authorities; where a brief fails to comport with this standard, we may dismiss the appeal entirely or find certain issues waived). However, here, we cannot thoroughly review J.M.'s sufficiency of the evidence claim without determining the statutory elements required by Act 21. As such, we will address whether Act 21 requires a finding of "imminent risk" despite J.M.'s lack of argument in this regard.
[7] We also note that J.M. argues that the court improperly applied Act 21 retroactively in violation of In re K.A.P., where we held that Act 21 is not retroactive because "the law does not give the prior [juvenile] offense any different legal effect than it had when he committed the offense." In re K.A.P. 916 A.2d at 1160. It appears, however, that J.M. misunderstands "retroactivity." He offers no coherent argument regarding how Act 21 "attaches new legal consequences to events completed before its enactment." Id. at 1159-60 (citing Landgraf v. U.S.I. Film Products, 511 U.S. 244, 269-70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Instead, he argues the court applied the statute "retroactively" by relying on "past reports" of J.M.'s treatment instead of the current SOAB report by Dr. Stein. This argument is not a coherent claim based upon a statute's retroactive application. Moreover, our review of the record reveals that the court did not rely on "past reports" but, instead, on Dr. Travia's testimony in which she evaluated J.M.'s current mental state and likelihood of reoffense. Thus, this claim is meritless.